## Louisville & Nashville Railroad Company v. Hensley.

(Decided January 30, 1931.)

ASHBY M. WARREN, J. F. DAVIS, JESSE MORGAN and C. S. LANDRUM for appellant.

W. A. STANFILL for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

By this appeal, the Louisville & Nashville Railroad Company seeks the reversal of a judgment for $665.97

recovered against it by Hensley for damages to a carload of watermelons.

On June 2, 1927, a carload of watermelons was shipped from Sidney, Fla., to K. Hensley, Hazard, Ky.; the bill of lading therefor being signed, "W. O. Hodges, Shipper per R. W. Ward."

On night of May 29, 1927, a torrential rainfall began in the watershed in, about, and above Hazard. The result was what is commonly known as "the Hazard Flood," by which great havoc was wrought in and about that city.

Between 7 and 7:30 a. m. June 6, 1927, R. W. Ward showed up in Winchester, Ky., claimed he owned the melons, and requested the shipment to be stopped at Winchester on account of the flood conditions at Hazard, so the railroad company says. This carload of melons was soon located by the yardmaster; it was then in a train at Patio and ready to go to Hazard, but the railroad company says that, pursuant to Ward's instructions, this car was cut out of the train. Ward came back about 9:30 or 10 o'clock that morning, according to the evidence for the railroad company, and said he was going to try to dispose of the melons. He was seen no more that day, and the Louisville & Nashville Railroad Company says it got no further instructions. The railroad company wired W. O. Hedges for disposition and was advised to hold the car for the arrival of Hensley. Hensley was not to be found, and the railroad company unloaded the melons and placed them in cold storage.

Hensley, having motored through from Florida, reached Hazard on June 8th, and at once began an effort to locate the melons. They were located on June 11th, at Winchester, the agent was advised to have them come forward; and on June 12th the melons were reloaded and started for Hazard. They arrived on June 14th, and Hensley paid a freight bill thereon of $177.03.

The melons, so Hensley says, were in such bad condition as to be of no value.

Hensley sued for the value of the melons ........................................................ $843.00
And the freight he had paid on them . 177.03

Total ........................................................ $1,020.03

The jury returned a verdict for $665.97. This was arrived at by deducting from the value of the melons the freight paid on the shipment. This verdict will have to stand unless the court committed some error which probably caused the jury to reach an erroneous conclusion.

We shall now consider the various alleged errors upon which the railroad company relies for reversal.

## The Evidence.

There was evidence that the condition of these melons was the result of improper loading, by reason of which the melons rolled and bumped against each other in the car, by which they were bruised, and that this produced in them such changes that they were not marketable.

A sharp issue then arose as to whether this bruising was the result of improper loading at Sidney, Fla., or when the melons were reloaded at Winchester, Ky. Hensley was properly permitted to state that, when he examined the car as delivered to him at Hazard, the melons were not properly loaded. That was a matter which any shipper of melons could discover, by an examination of the melons in the car.

The railroad company says Hensley was improperly allowed to state the melons were properly loaded in Florida. It is mistaken about that. All Hensley testified was that he employed and paid a licensed melon packer to load these molens. There is no evidence directly showing who loaded these melons in Florida or that they were properly loaded there. The burden of showing they were improperly loaded originally would be on the railroad company. We find no error in the evidence.

## The Act of God.

The railroad company had pleaded that the delay of this shipment resulted from "the Hazard Flood," a matter beyond its control, but there was no evidence to sustain that. The delay of this shipment, according to the evidence for the railroad company, was not directly due to this flood at all. The melons were coming through in what seems to be fair time, and, if it had not been for their stoppage in Winchester, would probably have reached Hazard on or before June 8th. Indirectly this flood may have caused this delay by alarming Ward and

causing him to have the shipment stopped at Winchester, if he did, but directly this flood had nothing to do with any delay.

## THE BOARD OF HEALTH ORDER.

The railroad company says it should be relieved of all responsibility for this delay because of an order issued by the board of health at Hazard forbidding it to bring these melons to Hazard, but it had pleaded no such defense, nor could it very well have done so, for these melons were stopped at Winchester on June 6th, and this order was not issued until June 10th, and seems to have been canceled the very day it was issued. It had nothing to do with the delay.

## THE MEASURE OF RECOVERY..

The court, at the instance of Hensley, gave the jury this instruction: "If you find for the plaintiff under Instruction No. 1, you should find for him such a sum in damages as you may believe from the evidence is the fair market value of the said melons at Hazard, Kentucky, less the amount of the freight charges paid by the plaintiff to the defendant, and not to exceed in all the sum of $665.97."

The railroad company complains of this, and says the jury should have been instructed as indicated in Gus Datillo Fruit Co. v. L. & N. R. Co., 226 Ky. 813, 11 S. W. (2d) 953. The difference between this case and the Datillo case consists in this, that in the Datillo case the shipment was only partially damaged, whereas in this case the evidence is the shipment when received was worthless.

In saying this we have not overlooked the statement made by Hensley, in his claim filed with the railroad company, that he sold $150 worth of melons, as he explained in his evidence that this $150 came from the sale of 280 melons contained in another shipment. Nor have we overlooked the statement, of Wooton that he may have got $25 or $30 out of the shipment, for he details the difficulty he had in trying to sell them, that people would return the melons and demand their money, and that they were in such condition as not to pay the cost of handling them. There was no evidence the melons were of any value when received. Hensley says they were worthless, and so does Wooton. Dr. Gross

testified he saw these melons, but no one asked him if they had any value.

J. M. Johnson, the agent for the railroad company at Hazard, testified in this case, but the defendant asked him nothing about the condition of the melons, and of course the plaintiff did not. Mr. Friel, the agent of the railroad company at Winchester, says he saw them there and the most of them were bad. The evidence of Toohey, the cold storage man at Winchester, is that these melons had no commercial value at all. Under the evidence the instruction on the measure of recovery was correct.

### QUESTIONS OF DIRECTED VERDICT.

The railroad company insists it was entitled to have the jury instructed peremptorily to find for it, and bases this claim on many things.

First, it claims it was entitled to such because the melons were plucked from dead vines and never did have any value. That is what the evidence for it shows, but Hensley's evidence is that the vines from which these melons were plucked were fresh green vines, and that this carload was from the first plucking. That certainly put that matter in issue, and the railroad company was not entitled to a peremptory instruction on that feature. What we have already said disposes of its claim for a peremptory instruction because of any act of God, or any act of the board of health.

The bill of lading under which this shipment was made contained this provision:

"Except in case of negligence of the carrier or party in possession (and the burden to prove freedom from such negligence shall be on the carrier or party in possession), the carrier or party in possession shall not be liable for loss, damage, or delay occurring while the property is stopped and held in transit upon the request of the shipper, owner, or party entitled to make such request, or resulting from a defect or vice in property, or for country damage to cotton, or from riots or strikes."

The court instructed the jury by instruction No. 3 to find for the railroad company if it believed from the evidence this shipment was stopped by Ward at Winchester, Ky. The evidence for the railroad company was that this shipment was stopped by Ward's direction.

This is taken from Ward's evidence: "I did not order car stopped at Winchester, Kentucky, but ordered it held there after it had arrived, waiting further instructions from me."

That is but another way of saying the same thing, and this verdict cannot be upheld. If the jury had followed this instruction, it would have found for the railroad company under this evidence.

"To the jury, the instructions (no matter who may have offered them), whether good or bad, are the whole law of the case, and if disregarded their verdict will be set aside, though it may be correct and the instructions erroneous." Farmers' Bank & Trust Co. v. Harding, 209 Ky. 3, 272 S. W. 3, 5."

The railroad company could know but two parties in its transportation of these melons, W. O. Hodges of Sidney, Fla., the consignor and K. Hensley, Hazard, Ky., the consignee. To it, these melons were the property of Hensley, and no one else had any interest therein or control thereover except such right of stoppage in transit as Hodges might have. We have no question here of what the railroad company's rights would have been had it known Ward was the agent of Hodges and vested with plenary authority to act for Hodges regarding the melons. No claim was made that Ward was acting for Hodges; on the contrary it is shown he claimed the melons, he proposed to control their movement, not as the agent for either consignor or consignee, but as the owner of them. Ordinarily a carrier acts at its peril, when it deals with a shipment as directed by a stranger to the bill of lading. See 10 C. J. 261, sec. 376; 4 R. C. L., p. 843, sec. 295.

Instruction 3 was erroneous. It told the jury Ward was the real consignor of the shipment of melons. That was not the case, the record shows conclusively Hodges was the consignor. Ward was claiming to own them. If on the next trial there is evidence to support such an issue, the court will modify instruction 3 and should say to the jury that the railroad company cannot be excused for any delay in the shipment of these melons resulting from observation by it of instructions given by Ward unless the jury shall from the evidence find Ward was then the owner of the melons or was the agent of either Hodges or Hensley.

The judgment is reversed.